Plaintiffs-appellants Robert B. Ott, Jr., and Kevin D. Ott appeal from the summary judgment entered by the Hamilton County Court of Common Pleas in favor of defendants-appellees Connecticut General Life Insurance Company (CG), Howard Tomb, and Michael B. McMannon, on claims for breach of an oral contract, breach of fiduciary duty, fraud, breach of the covenant of good faith and fair dealing, gross negligence and recklessness, and reformation.
 FACTS AND PROCEEDINGS
Robert Ott, Sr., is the owner and chairman of The Hennegan Company, a family printing business. Robert, Jr., and Kevin are the sons of Robert, Sr., and his wife, Mary, and are involved in the management of The Hennegan Company.
In the early 1980s, out of a concern that Robert, Jr., and Kevin might have to sell the company to pay estate taxes when he and his wife died, Robert, Sr., began to investigate the possibility of purchasing life insurance as a means of paying those taxes. Initially, Robert, Sr., obtained a policy from Crown Life Insurance Company and designated The Hennegan Company as the beneficiary. Donald Fleck, vice-president of The Hennegan Company, subsequently informed Robert, Sr., that naming the company as the beneficiary of the policy was undesirable because it would increase the company's value and, therefore, would ultimately result in increased estates taxes. As a result, Robert, Sr., began to consider alternative means of defraying estate taxes.
In 1983, Robert, Sr., Mary, and Fleck met with Tomb and McMannon, insurance professionals, to discuss the potential of the Otts' purchase of additional life insurance. Tomb and McMannon recommended replacing the Crown Life policy with a $6 million policy from Manufacturers Life Insurance Company of Canada (Manulife). According to Robert, Sr., and Mary, Tomb and McMannon told them that the policy would require only four premium payments.
In 1984, Robert, Sr., and Mary purchased the Manulife policy. Robert, Jr., and Kevin were named as both the owners and the beneficiaries of the policy. The terms of the policy stated that annual premium payments of approximately $147,000 were due until death. The Otts stated that they were upset when, in 1987 or 1988, Tomb and McMannon informed them that premium payments for five additional years would be required. Fleck, whom Robert, Sr., relied on for advice regarding the purchase of insurance, stated, however, that he understood, from his involvement in the discussions and presentations by Tomb and McMannon, that the Manulife policy was structured so that it would generate certain earnings. And if those earnings were sufficient, they could be used to pay future premiums, thereby eliminating the Otts' out-of-pocket payment of future premiums. He also stated that he understood that policy earnings were uncertain and were not guaranteed. Accordingly, if policy earnings did not meet certain projections, the Otts might be required to pay more out-of-pocket premiums. Furthermore, Fleck stated that he had discussed the structure of the policy with Robert, Sr., and believed that he understood it.
Aware of the Otts' dissatisfaction with the Manulife policy, Tomb and McMannon recommended that they replace it with a new policy. They first sought to replace it with a single policy to be issued by Phoenix Mutual Life Insurance Company. However, when Phoenix was only willing to issue a policy in the amount of $4.5 million, Tomb and McMannon proposed that a second policy be purchased from CG to cover the shortfall. Tomb and McMannon presented Robert, Sr., and Mary with written proposals detailing the recommended option. Fleck was again heavily involved in the insurance discussions and viewed the written proposals. One of these written proposals, utilized at an October 1988 meeting, illustrated that a $4.5 million Phoenix policy would require premium payments of $90,000 for seven years and that a $3 million CG policy would require premium payments of $60,000 for seven years. The proposal contained no language to the effect that premium payments might, under some circumstances, exceed seven years. According to the Otts, Tomb and McMannon assured them that, after seven years of out-of-pocket premium payments, policy earnings would be sufficient to fund each policy.
Ultimately, the Otts purchased one policy from Phoenix in 1988, in the amount of $4.5 million, and one policy from CG in 1989, in the amount of $3 million. Again, Robert, Jr., and Kevin were designated as both the owners and the beneficiaries of the policies. The two were only peripherally involved in the process, however. The terms of both policies stated that premium payments were due annually until death. Although Fleck reviewed the policies, none of the Otts did.
Each year after the issuance of its policy, CG provided the Otts with statements reflecting the earnings of the policy. A statement from 1989 reflected that more than seven premium payments were projected, as did a statement from 1992. According to the Otts, however, it was not until 1995 that they first became aware that more than seven premium payments would be required for the CG policy, and that the Phoenix policy would also require additional premium payments. Fleck, however, stated that, prior to the purchase of the policies, he was aware that more than the projected number of premium payments might be required if policy earnings fluctuated. He stated that his understanding of the current policies was essentially similar to his understanding of the Manulife policy. Furthermore, Wiley Dinsmore, the company's attorney and one of its board members, stated that, after meeting with Tomb and McMannon in 1988, he understood that the CG policy might require more than the seven premiums that had initially been projected.
On May 20, 1997, Robert, Jr., and Kevin, as the owners of the Phoenix and CG policies, filed suit against Tomb, McMannon, and CG, asserting claims of breach of an oral contract, breach of fiduciary duty, fraud, breach of the covenant of good faith and fair dealing, gross negligence and recklessness, and reformation. All of these claims related to Robert, Jr., and Kevin's allegation that they and their parents had been assured that the Phoenix and CG policies would require no more than seven out-of-pocket premium payments. After discovery closed, Tomb, McMannon, and CG moved for summary judgment on all claims. By decision of April 9, 1998, the trial granted the defendants' motions, thereby dismissing all the Otts' claims. In so doing, the trial court concluded that, as a matter of contract law, the Otts' failure to read the CG policy, which detailed that more than seven premiums would be required, precluded their claims.
The Otts have timely appealed the trial court's judgment and bring three assignments of error. In their first assignment of error, they assert that the trial court erred in holding that their claims failed due to their failure to read the insurance policy. In their second assignment of error, they assert that the trial court erred in granting summary judgment where genuine issues of material fact remained in dispute. Finally, in their last assignment of error, they assert that the trial court erred in holding that the relationship between themselves and Tomb, McMannon, and CG was purely contractual in nature.
 ANALYSIS
In reviewing the propriety of the trial court's entry of summary judgment, we independently review the record to determine if summary judgment is appropriate. We afford no deference to the trial court's decision in answering this legal question.[1]
Summary judgment is appropriate if it can be said, with the evidence viewed in a light most favorable to the party opposing the motion, that (1) no genuine issue of material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party opposing the motion.[2]
Our independent review of the record has led us to focus on one undisputed aspect of the evidence that is fatal to the Otts' claims. It is undisputed that Fleck, who participated in the negotiation and purchase of the policies at issue, who advised the Otts on these matters, and who was primarily responsible for understanding the policies and reviewing the materials provided by Tomb and McMannon, knew, prior to the purchase of the policies, that the number and amount of premiums might potentially differ from the projections in the proposals presented by Tomb and McMannon, and that, therefore, the Otts' obligation would not necessarily be limited to seven premium payments. Because Fleck functioned as the Otts' agent, the Otts, as the principals, were chargeable with and bound by Fleck's knowledge of this fact, which he received in the course of his employment and within the reach of his authority.[3] Furthermore, Wiley Dinsmore, the attorney for the company and a member of its board of directors, was also aware that the number and amount of premiums could vary from those projected by Tomb and McMannon in their proposal. As a matter of law, then, the Otts knew that their obligation to pay premiums would not necessarily end after seven payments had been made. Given this, the Otts could not, as a matter of law, prevail on their claims, which were premised on the allegation that they and their parents were deceived, by Tomb, McMannon, and CG, into believing that they would be required to make no more than seven premium payments. Accordingly, the second assignment of error is overruled, the remaining assignments are mooted, and the judgment of the trial court is affirmed.
Judgment affirmed.
 Doan, P.J., Gorman and Sundermann, JJ.
 Please Note:
The court has placed of record its own entry in this case on the date of the release of this Decision.
[1] Morehead v. Conley(1991), 75 Ohio App.3d 409, 411,599 N.E.2d 786.
[2] Civ.R. 56(C); Temple v. Wean United, Inc.(1977), 50 Ohio St.2d 317,327, 364 N.E.2d 267, 274.
[3] State ex rel. Nicodemus v. Industrial Comm.(1993), 5 Ohio St.3d 58,448 N.E.2d 1360, 1362(quoting Raible v. Raybel [1954],162 Ohio St. 25, 120 N.E.2d 425).